UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JENNIFER T. WAGONER,             )
                                     )
               Plaintiff,    )
                                     )
                v.          )   Case No. 1:11-cv-01054-TWP-DML
                                     )
J.P. MORGAN CHASE BANK, N.A.,    )
                                     )
             Defendant.    )

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant J.P. Morgan Chase Bank, N.A.'s ("Chase") Motion for Summary Judgment (Dkt. 45). Plaintiff Jennifer T. Wagoner ("Ms. Wagoner") brought claims against Chase alleging employment discrimination based upon her sex and/or pregnancy under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) ("Title VII"), and the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) ("PDA"), alleging that she was impermissibly terminated after informing Chase that she was pregnant. (Dkt. 1.) Chase has also moved to strike portions of Ms. Wagoner's Surreply. (Dkt. 59.) For the reasons set forth below, Chase's Motions to Strike and for Summary Judgment are **DENIED**.

## I.  FACTUAL BACKGROUND

The following material facts are not in dispute and are viewed in the light most favorable to Ms. Wagoner as the non-moving party. *See Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 728 (7th Cir. 2011). Ms. Wagoner began working for Chase [1] in 2003 as a Branch Manager for its Beech Grove, Indiana branch, subsequently moving to Chase's Southport and Emerson branch in Indianapolis, Indiana. Ms. Wagoner later took a position as a Sales Wholesaler, which she held

---

[1] Ms. Wagoner began her employment with Bank One, which was later acquired by Chase. Bank One will be included in the reference "Chase."

for approximately three years.  She then worked as a District Manager covering the eastern part of Indianapolis and slightly beyond.

In 2009, Ms. Wagoner applied for a position as a Business Banker.  Area Manager Lynette Siciliano ("Ms. Siciliano") and Market Manager Rod Simpson hired her for the position, effective October 1, 2009.  As a Business Banker, Ms. Wagoner worked out of Chase's College Park branch.  Throughout her employment as a Business Banker, Ms. Wagoner reported to Ms. Siciliano, who was responsible for managing approximately twelve Business Bankers in Indiana and Kentucky.  Ms. Wagoner's responsibilities as a Business Banker were to assist current and prospective customers with meeting their business banking needs. Around the time Ms. Wagoner was hired as a Business Banker, Chase also hired three males for the same position in other branch locations, Ed C., Ryan M. and Devon N.

New Business Bankers were given a six-month "ramp-up" period in which to reach the monthly target performance goals expected of Business Bankers, so expectations increased as Business Bankers became more experienced.  After six months, Business Bankers were expected to reach all of the monthly performance targets.   Chase measured Business Bankers' performance in six areas, including (1) demand deposit acquisition ("DDA"), including accounts that were "first for the customer"; (2) relationship ratio; (3) DDA account funding percentage greater than $500.00; (4) premier client contact; (5) number of credit applications; and (6) sales credits.  After six months in the Business Banker position, Ms. Wagoner was not meeting all of the performance goals set for Chase Business Bankers.  In March 2010, upon Ms. Siciliano's recommendation, Ms. Wagoner applied for a Business Wholesaler position with Chase, but was not selected for the position.

2

Ms. Wagoner became pregnant with her first child in March 2010, which she confirmed at a doctor's visit on April 21, 2010.  Sometime at the end of April following her doctor's visit, Ms. Wagoner informed Ms. Siciliano of her pregnancy.  Ms. Wagoner was not meeting certain performance standards and on May 5, 2010, Ms. Siciliano met with Ms. Wagoner to deliver a Performance Action Plan ("PAP").  Ms. Siciliano used the PAP as a coaching tool to help the Business Bankers that she supervised improve their performance.  Ms. Siciliano explained the areas upon which she wanted Ms. Wagoner to focus, and the areas in which she felt Ms. Wagoner was deficient.  The PAP required Ms. Wagoner to meet the required expectations by June 1, 2010, and her plan specifically stated that failure to meet the expectations by the end of the plan may result in formal corrective action, i.e. a written warning.

On July 13, 2010, Ms. Siciliano gave Ms. Wagoner a sixty-day written warning that ran from July 7 to September 7, 2010.  The written warning stated "[if] at any time, it is determined that sufficient progress toward these goals is not being made then further corrective action may occur, up to and including dismissal."  Dkt. 47-6 at 8.  By the end of July 2010, Ms. Wagoner had improved her performance in at least three of the six measured categories, but she still was not meeting the targets.  On August 16, 2010, Ms. Siciliano recommended that Ms. Wagoner be terminated.   Ms. Siciliano prepared a Recommendation of Termination form, which was reviewed and approved by Market Manager Rod Simpson and by Human Resources Business Partner Tiffany Harris.  On August 20, 2010, Ms. Siciliano met with Ms. Wagoner and Branch Manager Tori Hart and informed Ms. Wagoner that her employment was terminated.  On August 23, 2010, the next business day following her termination, Chase sent an offer letter to Hieu D. offering him the position to replace Ms. Wagoner.  Hieu D. had previously worked for Ms. Siciliano at Chase, but had left in March 2010 for a business banking position with Huntington

3

Bank.  Hieu D. left his position with Huntington on August 16, 2010, and accepted the offer at Chase on August 24, 2010, the day after he received the offer letter.  Because he had previously worked for Ms. Siciliano, Hieu D. did not have a formal interview for the Chase Business Banker position.

On or about August 17, 2010, shortly prior to her termination, Ms. Wagoner applied for another position at Chase. The application stated that internal applicants must meet certain requirements to post for a position, which included confirming that they are not currently on a written warning and that they either (1) had been in their current position for a year; (2) had their supervisor's approval to post for the position; or (3) had been notified that their current position was eliminated.  At the time she filled out the application, Ms. Wagoner was under a written warning, had not been at her position for a year, and had not obtained approval from Ms. Siciliano to apply for the position.  Ms. Wagoner was terminated prior to interviewing for the position.

Ms. Wagoner was not the only Business Banker who experienced performance problems in 2009 and 2010.  When Ms. Wagoner received a PAP on May 5, 2010, her performance exceeded or equaled Devon N.'s performance in four out of the six categories, and exceeded Ed C's and Ryan M.'s performance in three out of the six categories.  At the time Ms. Wagoner received a written warning in July 2010, her performance exceeded or equaled Ed C.'s performance in four out of six categories, and exceeded Ryan M's and Devon N.'s performance in three out of the six categories.  However, none of the three male Business Bankers who started around the same time as Ms. Wagoner received either a PAP or a written warning at the same time Ms. Wagoner received them in May and July 2010, and none of them were terminated for their performance.

4

At the time of Ms. Wagoner's termination, Ed C.'s performance was not meeting Chase's standards for Business Bankers.  In late August or early September 2010, Ms. Siciliano told Ed C. that his branch in Broad Ripple was not performing well enough to be classified as a B1 branch, and he was told that a B2 classification would be more appropriate.[2]  Ed C. was given the opportunity to stay on as a Business Banker and continue to try and grow the branch as a B1, or he was given the option of going back to being a Personal Banker Small Business Specialist and eliminating the Business Banker position from the branch, which would classify it as a B2 branch.  Ed C. decided that he wanted to return to the position of Personal Banker Small Business Specialist; however, all of the banker positions at the Broad Ripple branch were full. Chase transferred a female banker to a different location to make room for Ed C. to remain at the Broad Ripple branch as a Personal Banker Small Business Specialist.

Ryan M., a Business Banker at the White River branch, had performance figures that were worse than or equal to Ms. Wagoner's performance at the time she was terminated. However, Ms. Siciliano did not place Ryan M. on a PAP until August 5, 2010.  From August to September 2010, Ryan M.'s performance decreased in every category that Chase measured for Business Bankers.  However, instead of issuing him a written warning, Ms. Siciliano placed Ryan M. on a second PAP on November 9, 2010.

Devon N. was the Business Banker at the Brownsburg, Indiana branch from September 1, 2009 through September 30, 2010.  Throughout the relevant period, Devon N. never received a PAP or a written warning, even though his performance was below Ms. Wagoner's performance in three of the six categories.  In August 2010, Devon N. expressed interest in returning to the

---

[2] Chase used a three-tiered system for classifying branches in Indiana based upon their size.  B1 branches were the largest and had enough business clients that they needed a Business Banker.  B2 branches were the second largest and employed a Personal Banker Small Business Specialist, who did work in both personal banking and business banking.  B3 branches were the smallest, and the Branch Manager handled all of the business accounts.

position of Personal Banker to Ms. Siciliano, and he was allowed to return to that position effective October 1, 2010.

During the relevant time period, two other males who held Business Banker positions were also subject to varying degrees of discipline. The first, Kevin J., became a Business Banker at the Bloomington, Indiana main branch on June 1, 2009. After serving as a Business Banker for nearly eight months, he was put on a PAP on January 15, 2010 for not hitting the performance targets for five out of the six categories. When Kevin J.'s performance had not improved by the end February 2010, Ms. Siciliano placed him on a second PAP in March 2010. On August 17, 2010, Kevin J. received a third PAP when his performance did not meet the targets in five out of six categories, and when his performance did not improve, he was placed on a fourth PAP on September 10, 2010. Kevin J. was never issued a written warning in 2010.

Secondly, Timothy M. became the Business Banker at Chase's Stafford Pointe branch in Plainfield, Indiana on July 1, 2009. On February 10, 2010, Timothy M. received a written warning for exceeding the number of unexcused absences as defined by Chase's unscheduled absence policy. On June 16, 2010, he received a second written warning for the same violation. The June 16th warning stated that if he did not demonstrate and maintain a satisfactory level of performance, or if any other problems developed, such as performance, attendance, or tardiness, further corrective action could occur, up to and including termination. Timothy M.'s performance declined, and on August 4, 2010, during the period of the second written warning, he received a PAP because of his low performance in the six categories. When Timothy M.'s performance did not improve in August 2010, he received a second PAP on September 2, 2010. And, on October 12, 2010, Timothy M. received a third written warning, this time for his performance in the six categories. In sum, Timothy M. received a total of two PAPs and three

written warnings in 2010, and was never recommended for termination.  Additional facts will be added below as necessary.

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."  *Hemsworth*, 476 F.3d at 490 (citation omitted).  "In much the same way that a court is not required to scour the record in search of evidence to defeat the motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). "[N]either the mere existence of some alleged factual dispute between the parties . . . nor the existence of some metaphysical doubt as to the material facts . . . is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## III.   <u>DISCUSSION</u>

Ms. Wagoner alleges that she was placed on a PAP, issued a written warning, and subsequently terminated within a three and one-half month time span as a result of informing

Chase of her pregnancy, whereas other male Business Bankers were either issued multiple PAPs and written warnings, did not receive any discipline, and/or were allowed to pursue other positions within Chase rather than face discipline or termination for deficient performance. Chase argues that Ms. Wagoner cannot show that her discipline and termination were related to her pregnancy or gender, and if she were to receive any damages as a result of a finding of unlawful discrimination, those damages would be limited by after-acquired evidence because she included false information on her August 17, 2010 application, subjecting her to termination. Chase has also challenged the admissibility of certain evidence cited in Ms. Wagoner's Response brief (Dkt. 50), and moves to strike portions of her Surreply (Dkt. 58).

**A.      Evidentiary Issues and Motion to Strike**

In its Reply, Chase challenges the admissibility of Ms. Wagoner's declaration (Dkt. 51-8) and argues that it should be stricken.  Specifically, Chase argues that Ms. Wagoner's declaration contradicts her deposition testimony regarding (1) when she told Ms. Siciliano about her pregnancy; and (2) when Ms. Siciliano recommended that she apply for another position.  In the Seventh Circuit, a summary judgment non-movant may not use an affidavit to contradict her sworn deposition testimony in order to preclude summary judgment.  *Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 532-33 (7th Cir. 1999).  However, "[w]hen a 'deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.'" *Piscione*, 171 F.3d at 532-33 (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995)).

Ms. Wagoner testified in her deposition that she could not specifically recall when she informed Ms. Siciliano about her pregnancy, stating that "[i]t could have been ending of April, early May." Dkt. 47-3 at 19, 106:9-10. The date when Ms. Wagoner informed Ms. Siciliano about her pregnancy, before or after she was issued the PAP in May, is a material fact in this case. Ms. Wagoner addressed it in her Response with a declaration stating that she recalled telling Ms. Siciliano about her pregnancy within several days after she confirmed her pregnancy with her doctor, who she saw on April 21, 2010, even though she could not remember the exact date. Dkt. 51-8 at 1, ¶ 7. Chase argues this scenario is similar to the Seventh Circuit's decision in *LaFary v. Rogers Grp., Inc.*, 591 F.3d 903 (7th Cir. 2010) where the court determined the plaintiff could not use an unsupported affidavit to prove that her pregnancy announcement date occurred before a certain day, after testifying in her deposition that she did not know when her employer learned that she was pregnant. However, the *LaFary* case is distinguishable from this case. Ms. Wagoner testified in her deposition as to a time frame in which she believed she told Chase about her pregnancy. To support her assertion in her declaration, Ms. Wagoner also offered evidence in the form of her doctor's billing statement, which served to refresh her recollection. Dkt. 51-8 at 3. The plaintiff in *LaFary* did not recall any time frame for the disclosure of her pregnancy, and offered no support for her later statement regarding her pregnancy announcement date. Thus, the Court finds that Ms. Wagoner's declaration does not contradict her deposition testimony and it should not be stricken.

Chase has also asked the Court to strike the exhibit to Ms. Wagoner's declaration, consisting of the billing statement from her doctor which she used to refresh her memory about her pregnancy announcement date. (Dkt. 51-8 at 3-5.) Chase asserts that Ms. Wagoner failed to disclose the document under Federal Rule of Civil Procedure 26(a)(1), and it should therefore be

stricken under Rule 37.   Moreover, Chase argues that Ms. Wagoner failed to provide this document in response to document requests served pursuant to Rule 34.   Ms. Wagoner argues that the billing statement was not responsive to Chase's request for her medical records, and that it was not known to be relevant until the time of her declaration when she had to use it to refresh her recollection regarding the date she announced her pregnancy.   The Court finds that exclusion of this evidence was justified and harmless, as Chase had already received Ms. Wagoner's medical records that corresponded to the billing statement; thus the document will not be stricken.   *See Musser v. Gentiva Health Svcs.*, 356 F.3d 751, 758 (7th Cir. 2004).

Additionally, Chase challenges the portion of Ms. Wagoner's declaration regarding when she applied for the Business Wholesaler position, arguing that this statement contradicts her deposition testimony.   Specifically, Chase argues that in her deposition testimony, Ms. Wagoner could not recall the timing of her application, and did not know whether it occurred before she was placed on the PAP or afterwards.   Ms. Wagoner later stated in her declaration that she applied for the Business Wholesaler position in March 2010, prior to being issued a PAP.   This declaration was based upon documents produced by Chase after Ms. Wagoner's deposition, including a log of Ms. Wagoner's internal applications, which indicated that Ms. Wagoner applied internally for a different position in March 2010.   Because this information does not conflict with Ms. Wagoner's deposition testimony, which was due to a lapse in memory, the Court finds that this information should not be stricken.

Finally, Chase has filed a motion to strike sections III and IV of Ms. Wagoner's Surreply, arguing it goes beyond the scope of Local Rule 56-1(d).   Local Rule 56-1(d) permits the non-movant to file a surreply when the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the non-movant's response.   S.D. Ind. L.R. 56-1(d).   The

rule further provides that the surreply "must be limited to the new evidence and objections."  *Id.*
Ms. Wagoner's surreply addresses additional facts—namely that Ed C. sought and requested a
demotion; that Ms. Wagoner refused to take a demotion; that Ms. Wagoner was not meeting her
previous supervisor's expectations; and that Ms. Wagoner admitted to providing false responses
on her application—by providing a supplemental statement of facts in section III.   Such
supplemental statement is contemplated by Local Rule 56-1.  *See Pike v. Caldera*, 188 F.R.D.
519, 353 (S.D. Ind. 1999).   Additionally, section IV of Ms. Wagoner's surreply addresses
Chase's new evidence that the Business Bankers' performances were evaluated under the Branch
Business Banking Performance Management Guide, and Chase's assertion that the male
Business Bankers were not similarly situated to Ms. Wagoner.  Because these sections address
new evidence cited for the first time by Chase in their Reply brief, Ms. Wagoner's surreply is not
improper under Local Rule 56-1(d).  Therefore, Chase's motion to strike is **DENIED**.

## B.     Discrimination Claim

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any
individual, or otherwise to discriminate against any individual with respect to his compensation,
terms, conditions, or privileges of employment, because of such individual's race, color, religion,
sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  The Pregnancy Discrimination Act does not
create new rights or remedies, but rather clarifies that discrimination based upon a woman's
pregnancy is also sex discrimination.  42 U.S.C. § 2000e(k); *Newport News Shipbuilding & Dry
Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983).  "The PDA does not require preferential treatment
for a pregnant employee – just the same treatment as a nonpregnant employee would receive."
*Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chi.*, 104 F.3d 1004, 1011 (7th Cir.
1997).

As with other Title VII discrimination claims, pregnancy discrimination can be proven either directly, by presenting direct and/or circumstantial evidence on the issue of discriminatory intent, or indirectly using the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting method.  *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004).  The direct method requires that the plaintiff produce evidence that the defendant was motivated by animus toward a protected class when she suffered some adverse employment action. *Andonissamy v. Hewlett–Packard Co.*, 547 F.3d 841, 849–50 (7th Cir. 2008).  To succeed under the direct method, Ms. Wagoner must offer either direct evidence that would prove discriminatory intent, without reliance on inference or presumption, or "a convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker.  *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733-34 (7th Cir. 2011). The focus of the direct method of proof is whether the evidence offered "points directly" to a discriminatory reason for the employer's action.  *Darchak v. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009).  Ms. Wagoner does not have direct evidence of an intent to discriminate against her based upon her pregnancy—which would be something akin to an admission—so she must attempt to prove discriminatory intent using circumstantial evidence.[3]

Under the "convincing mosaic" approach, a plaintiff may present three broad types of circumstantial evidence.  The first type includes "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Silverman*, 637 F.3d at 734 (quoting *Troupe v. May Dep't. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)).  The second type includes evidence showing that the employer "systematically treated

---

[3] Ms. Wagoner does not provide any analysis of her claim under the indirect method, so the Court will only analyze her claim under the direct method.

other, similarly situated, nonpregnant employees better." *Id.* (quoting *Venturelli v. ARC Cmty. Svcs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003)).   The third type of circumstantial evidence is evidence that the plaintiff was passed over or replaced by a person not having the forbidden characteristic, and the stated reason for the different treatment is pretextual.  *Id.*; *Troupe*, 20 F.3d at 736.  A plaintiff does not have to produce all three types of evidence; each type of evidence is sufficient by itself to support a judgment for the plaintiff, or they can be used together.  *Troupe*, 20 F.3d at 736.  In the summary judgment context, the plaintiff need only produce evidence from which a rational trier of fact could reasonably infer that the employer took an adverse employment action against the plaintiff because she was pregnant; she does not have to produce the equivalent of an admission of guilt by the defendant.  *Id.*

### 1.   Suspicious Timing

Ms. Wagoner has presented evidence creating an issue of material fact regarding the timing of her adverse employment actions and her pregnancy.   Chase argues that the PAP coincided with Ms. Wagoner completing her six month "ramp up" period, and Ms. Wagoner was not performing at the level expected for Business Bankers.   While suspicious timing alone is rarely sufficient to defeat summary judgment, *Silverman*, 637 F.3d at 736, "suspicious timing may permit a plaintiff to survive summary judgment if there is other evidence that supports the inference of a causal link."  *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005).  It is undisputed that Ms. Wagoner became pregnant in March 2010.  Chase claims she did not inform her supervisor about her pregnancy until after she had received the PAP; therefore, it could not have been based upon the news of her pregnancy.   However, as discussed above, Ms. Wagoner has provided evidence that she informed Ms. Siciliano about her pregnancy in late April 2010, shortly before she received a PAP on May 5, 2010.  Dkt. 47-3, 106:9-10; Dkt. 51-8 at 1, ¶ 7.

Thus, there is a question of material fact as to whether Ms. Wagoner received the PAP before or after she told Ms. Siciliano about her pregnancy.

Additionally, Ms. Wagoner was issued a written warning that was to run for sixty days, from July 13 to September 7, 2010.  Chase argues the written warning stated that Ms. Wagoner was subject to termination at any time if her performance was not improving.  However, she was terminated thirty-four days into her written warning period, despite improvements in some of her performance categories.  Ms. Wagoner's termination also happened to occur when she was seven months pregnant and would soon be taking time off for maternity leave.  In viewing these facts in the light most favorable to the non-movant, Ms. Wagoner has shown that there are questions of material fact regarding whether the timing of her discipline and subsequent termination were related to Chase being informed of her pregnancy and her impending maternity leave, or whether it was solely due to her performance.

### 2.        Systematically Better Treatment of Similarly Situated Male Employees

Ms. Wagoner has also shown that there are questions of material fact regarding whether similarly situated male employees were systematically treated better.  "Whether a comparator is similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012) (internal quotations and citations omitted).  There is no definitive formula for making this determination; rather, courts must examine "all relevant factors, including whether the employees '(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications – provided the employer considered these latter factors in making the personnel decision.'"  *Warren v. Solo Cup Co.*, 516

F.3d 627, 631 (7th Cir. 2008) (quoting *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (additional citations omitted)).

Ms. Wagoner has identified five other males—Ed C., Ryan M., Devon N., Kevin J., and Timothy M.—who she argues are similarly situated and who systematically received more favorable treatment.  Chase asserts, without support, that these individuals were not similarly situated to Ms. Wagoner.  But all of these individuals held positions with Chase as Business Bankers during 2009 and 2010, all were under the supervision of Ms. Siciliano, and all were evaluated using the same six performance goals.  Thus, a reasonable fact-finder could conclude that these other Business Bankers were similarly situated to Ms. Wagoner.

While it is undisputed that Ms. Wagoner did not meet the performance standards set by Chase for Business Bankers, she has presented evidence that the other male Business Bankers also had performance deficiencies, yet were not subject to the same accelerated disciplinary process.  In viewing the facts most favorable to Ms. Wagoner, the male Business Bankers had performances that were equal to Ms. Wagoner's, yet Ms. Siciliano delayed in issuing them PAPs and written warnings, or issued them multiple PAPs without termination.  There is also a question of fact regarding whether Ms. Siciliano offered male Business Bankers the opportunity to take a demotion in response to their deficient performances, while not offering Ms. Wagoner the same opportunity.  These are sufficient questions of fact to which a reasonable jury could find that the five male Business Bankers were systematically and unjustifiably treated better than the pregnant Ms. Wagoner.

### 3.      Replacement by a Male Employee

Ms. Wagoner has presented evidence that she was replaced by a male employee following her termination.  Chase sent a written offer letter to Hieu D. the business day after Ms.

Wagoner was terminated.  Hieu D. did not have to submit an application or interview for the position previously held by Ms. Wagoner.  Additionally, Hieu D. left his position at Huntington on the same day that Ms. Siciliano recommended Ms. Wagoner for termination.  A reasonable jury could find that Chase had been in contact with Hieu D. prior to Ms. Wagoner's termination regarding replacing her as the Business Banker at the College Park branch.  Based on these facts, a reasonable fact-finder could conclude that Chase's reasons for replacing Ms. Wagoner with Hieu D. were pretext based upon the circumstance surrounding his hiring.  The pretextural circumstances might include the lack of an application or interview to determine whether Hieu D. had the necessary skills to work as a Business Banker at Chase and the timing of his departure from Huntington and hiring at Chase the next business day after Ms. Wagoner was terminated.

### C.      After-Acquired Evidence Doctrine

Chase argues that, even if it were to be found liable to Ms. Wagoner for discrimination under Title VII and the PDA, her damages would be limited by the after-acquired evidence doctrine.  Under the after-acquired evidence doctrine, if an employer, following the employee's termination, discovers that the employee engaged in wrongdoing that would have resulted in termination upon lawful grounds, neither reinstatement nor front pay is an appropriate remedy. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 361-62 (1995).  Chase argues that Ms. Wagoner provided false statements on an internal application on August 17, 2010 for which she could have been terminated.   However, "the inquiry focuses on the employer's actual employment practices, not just the standards established in its employee manuals, and reflects a recognition that employers often say they will discharge employees for certain misconduct while in practice they do not."  *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1048 (7th Cir. 1999) (quoting *O'Day v. McDonnell Douglas Helicopter Corp.*, 79 F.3d 756, 759 (9th Cir. 1996)).  Chase has

not provided evidence that it actually terminates every employee who includes inaccurate information on an internal job application; thus, there is a question of material fact as to whether Ms. Wagoner would have been terminated, not whether she was possibly subject to termination.

## IV.   CONCLUSION

The Court finds that Ms. Wagoner has presented sufficient questions of material fact that could create a "convincing mosaic" of circumstantial evidence for the fact-finder at trial.  There are sufficient questions of fact with regard to the suspicious timing of Ms. Wagoner's discipline and termination, the systematically different treatment of multiple similarly-situated male Business Bankers, and Ms. Wagoner's replacement by a male who was not required to submit an application or interview for the position.  A reasonable jury could find that this evidence, taken together, points to the conclusion that Ms. Wagoner was terminated due to her gender and/or pregnancy.  Because it has not shown that there are no questions of material facts, Chase's Motion for Summary Judgment (Dkt. 45) is **DENIED**.  Chase's Motion to Strike Plaintiff's Surreply (Dkt. 59) is also **DENIED**.


    **SO ORDERED.**

Date: _____
07/02/2013

                                                  Hon. Tanya Walton Pratt, Judge
                                                  United States District Court
                                                  Southern District of Indiana

17

DISTRIBUTION:

Quincy Erica Sauer
MACEY SWANSON AND ALLMAN
qsauer@maceylaw.com

Barry A. Macey
MACEY SWANSON AND ALLMAN
bmacey@maceylaw.com

Thomas E. Deer
OGLETREE DEAKINS
thomas.deer@ogletreedeakins.com

Bonnie L. Martin
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
bonnie.martin@odnss.com